**Barbara McCORMICK, Plaintiff,**

v.

**Donna E. SHALALA, Secretary of Health and Human Services, Defendant.**

No. 94–71345.

United States District Court,
E.D. Michigan,
Southern Division.

Dec. 8, 1994.

Michael J. Cantor, Gittleman, Paskel, Tashman, Blumberg & Walker, P.C., Southfield, MI, for plaintiff.

Mary S. Rigdon, Asst. U.S. Atty., U.S. Attys. Office, Detroit, MI, for defendant.

COHN, District Judge.

## I.

Plaintiff Barbara McCormick (McCormick) seeks judicial review of a final decision of the Secretary of Health and Human Services (Secretary) that she is not entitled to disability insurance benefits (DIB). McCormick applied for DIB on September 27, 1991, alleging disability since January 22, 1990.[1] She was found ineligible initially and on reconsideration. A hearing was held before an administrative law judge (ALJ) on June 18, 1993. McCormick testified and was represented by counsel, but there was no vocational expert testimony. On September 14, 1993, the ALJ found that McCormick was not disabled because she could perform her past relevant work. The Appeals Council denied her request for review.

McCormick then instituted this action for judicial review pursuant to 42 U.S.C. § 405(g). The matter was referred to a magistrate judge, before whom McCormick and the Secretary filed motions for summary judgment. On October 21, 1994, the magistrate judge issued a report and recommendation (MJRR), recommending that the ALJ's decision be upheld. The magistrate judge found that substantial evidence in the record supported the ALJ's findings that McCormick was able to perform her past relevant work and that she therefore was not disabled. McCormick filed objections to the MJRR and the Secretary responded. For the reasons stated below, McCormick's motion will be denied and the Secretary's motion will be granted.

## II.

### A.

The Secretary must follow a five-step sequential evaluation in determining whether a claimant is disabled under the Social Security Act. 20 C.F.R. § 404.1520 (1991). The Secretary must determine whether a claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment or combination of impairments, (3) meets or equals an impairment listed in the appropriate appendix, (4) is prevented by the impairment or combination of impairments suffered from engaging in the claimant's relevant past employment, or, (5) has the ability to engage in other gainful activity considering the claimant's age, education, past relevant experience and residual functional capacity.

The findings of the Secretary are conclusive if those findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 402, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971). The substantiality of the evidence must be based upon the record taken as a whole. *Futernick v. Richardson,* 484 F.2d 647 (6th Cir.1973).

1. McCormick had previously filed for benefits on March 26, 1991 alleging the same onset date of disability. This claim was administratively denied. The ALJ found that her September 27, 1991 application constituted a timely request to reopen and review the adverse administrative determination issued with respect to the March 26, 1991 application.

### B.

At the time of the hearing, McCormick was fifty years old with an eleventh grade education and one year of vocational training in business. Her past work consisted of jobs as an assembler, supervisor, and office worker for General Motors. She alleged disability since January 22, 1990 due to pain in her lower back, fibrositis, tendinitis of her left foot, seizures, and depression. Because of these injuries she was awarded worker's compensation and disability pension benefits.[2]

The ALJ determined that McCormick was not disabled under the Act because she could perform her past relevant work despite her impairments. The ALJ also found that:

1. McCormick met the disability insurance status requirements of the Act on January 22, 1990, the date she stated she became unable to work, and continued to meet them through December 31, 1996.

2. McCormick has not engaged in substantial gainful activity since January 22, 1990.

3. The medical evidence established that McCormick had a severe fibrositis, lumbosacral strain, status post inversion injury or peroneal tendinitis of the left ankle with early reflex sympathetic dystrophy, but that she did not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. McCormick's allegations of disabling pain, other symptoms and functional limitations resulting from her impairments so as to preclude substantial gainful activity were not supported by the objective medical evidence, the criteria of Social Security Ruling 88–13, and the Secretary's symptom regulation, and were not credible.

5. McCormick had the residual functional capacity to perform work related activities except for work requiring lifting more than 50 pounds occasionally; she could frequently lift or carry up to 25 pounds; also, McCormick could perform a good deal of standing or walking or mostly sitting with some pushing or pulling of arm or leg controls. McCormick did not have any nonexertional limitations.

6. McCormick's past relevant work as an assembler, supervisor and office worker in the automobile industry did not require the performance of work related activities precluded by the above limitations.

7. McCormick's impairments did not prevent her from performing her past relevant work.

### III.

#### A.

McCormick suffered a closed head injury at work in 1981 and since then has had low back problems and seizures. She takes phenobarbital and tegretol for her seizure condition. After suffering another injury at work in 1990, she was seen by Dr. Janda on April 18, 1990 for complaints of left foot and ankle pain. Dr. Janda's diagnosis was recurrent peroneal tendinitis. He placed her in a short-leg walking cast for one month and advised that she not return to work for six weeks. When McCormick returned for a follow-up visit on May 16, 1990, Dr. Janda fitted her with an air cast and instructed her to return to work in two weeks.

On June 20, 1990, at McCormick's next visit, Dr. Janda noted that she had recurrent peroneal tendinitis and restricted her to sitting work for the next 4–6 weeks along with a physical therapy program. A bone scan indicated that McCormick had "reflex sympathetic dystrophy or diffuse inflammatory infectious involvement" in the left foot. On July 26, 1990, Dr. Janda referred McCormick to the Pain Center for epidural steroid injections and prescribed physical therapy.

---

**2.** McCormick was injured at work on January 22, 1990. She received worker's compensation benefits for two years from that date. Subsequently, she received general disability benefits until her medical retirement was approved. She was not required to file for the disability pension she received.

On August 14, 1990, McCormick was admitted to Mercywood Hospital for reflex sympathetic dystrophy of the left lower leg. She received epidural nerve blocks from Dr. Janda and was able to put weight on her left leg after the injections.

On August 24, 1990, McCormick was examined by Dr. Young after twisting her left foot and ankle while getting out of bed the day before. Dr. Young diagnosed "left foot metatarsal nondisplaced shaft fracture" and a "history of reflex sympathetic dystrophy versus persistent peroneal tendinitis." McCormick was placed in a short-leg walking cast and instructed to use a cane or crutch when she walked. Later that day she underwent a left lumbar sympathetic nerve block by Dr. Patterson.

On September 20, 1990, Dr. Janda referred McCormick to Glenn Burdick, a psychologist, for possible placement into a pain management program, noting that the lower extremity pain blocks McCormick had been receiving were not producing lasting relief. Burdick reported that an MMPI psychometric test showed a clinical picture of a person who was "nervous, tense, irritable and unhappy." He stated that McCormick appeared to be "immobilized and withdrawn, and to be clinically depressed to a moderate degree" and recommended that she enter a comprehensive pain management program and increase her physical activity. He also believed it was essential for her to participate in occupational therapy to increase her endurance and to simulate the social environment of the workplace.

McCormick participated in an occupational therapy program for one month starting in January 1991, where she was seen three times a week for four weeks. Upon completion, the therapist reported that McCormick could walk over one mile continuously. She was also able to endure one hour of continuous "uptime" including walking, static standing and standing while shifting her weight back and forth. In addition to her doctor's restrictions from assembly line work, stair climbing, use of power tools, repetitive bending, and lifting over five pounds, the therapist recommended that while working

McCormick should be able to sit or stand at will, and not have to kneel or crouch.

On April 12, 1991, Dr. Kim, a physical medicine and rehabilitation specialist, stated that, in addition to her foot problems, McCormick suffered from lumbosacral strain with pelvic torsion. Dr. Kim reported that McCormick was able to walk without ambulatory aids, but had a capacity for decreased weight bearing on the left foot.

On November 18, 1991, Dr. Baker, a rheumatologist who had been seeing McCormick for 8–10 years, stated that McCormick had multiple medical problems of a "fibrositis type picture," and that she had "tremendous bouts with tendinitis and myositis which were aggravated by her job of factory work." He noted that McCormick was on a "number of medications which include analgesics, anti-inflammatory medications, muscle relaxants, etc." He also commented that McCormick's condition had improved "a great deal" since she had been off work. Dr. Baker also stated that McCormick could stand for about an hour without needing to sit down. Dr. Baker reported that "I have seen this lady for over 10 years; and I think that she has enough problems now that it is unlikely, in my opinion, that she could carry on any type of gainful employment for very long due to these problems." He later stated that McCormick was totally disabled from any occupation.

Because of a mistake at her pharmacy, McCormick took an accidental phenobarbital overdose on December 7, 1991, and was seen at the Emergency Room of St. Joseph Mercy Hospital for complaints of weakness. She was instructed to discontinue the medication and to contact her doctor.

On December 11, 1991, McCormick was referred to Dr. Jones, who reported "cervical and lumbar spine pain" and peripheral joint pain. Dr. Jones commented that McCormick had grand mal seizures by history but that she could not recall her last seizure or the frequency of episodes. Range of motion studies indicated that McCormick could only actively flex her left knee to 90 degrees. She was found to be right handed and to have 38 pounds of grasp strength in her right hand and ten pounds in her left hand as measured

on a dynamometer. These studies indicated that her right shoulder, hands, wrists and elbows were normal. No range of motion in the back was attempted because McCormick stated that she could not lie down without pain.

On January 29, 1992, a consultive evaluation was performed by Dr. Tenbusch, a psychologist. Dr. Tenbusch reported, "THIS IS AN EXTREMELY UNPLEASANT PERSON. She was hostile, withholding, and downright malignant throughout the session. She indicated no motivation to cooperate or to improve her mood or situation in life. She manifested no insight into the fact that her rage exacerbates her arthritis." Dr. Tenbusch's diagnosis was hostile personality, which was possibly a reaction to not working, and passive aggressive personality. Dr. Tenbusch's prognosis for McCormick was "guarded—this claimant may never get beyond her physical pain if she does not deal with her rage." Dr. Tenbusch scored her at 60 on the global assessment of functioning scale.

On February 7, 1992, McCormick was taken to the University of Michigan Hospital after pulling a gun at her home and threatening suicide but then calling for help. The contact report from the hospital stated that McCormick "appeared to be having an episode of major depression," and that she recently felt betrayed by her husband, felt unable to cope and exhibited poor judgment. The psychiatrist on call at the hospital, Dr. Bowdkin, noted that McCormick's speech and affect were slow and restricted and that she appeared to be an "intense, somewhat hostile middle aged female." Dr. Bowdkin also noted that McCormick had suffered multiple stressors, including the illness of her mother and the pharmacy accidental overdose, and that she reported a call from a woman claiming to be having an affair with her husband. McCormick adamantly refused hospitalization. She was sent home to be monitored by her family.

On March 17, 1993, McCormick was examined by Dr. McQuillan for a company disability pension. He noted that McCormick had pain with motion of her shoulders, elbows, hands, feet, and wrists and knees. He also noted that she was on no medications. Dr. McQuillan stated that he found McCormick to be totally and permanently disabled.

### B.

McCormick testified at the hearing that, at home, she cooked, washed dishes, made beds and did laundry. She occasionally went shopping. She took vacations in Kentucky once a year. She was able to drive short distances and would run small errands, go to the beauty shop and go to church weekly. She did not belong to any clubs. She did not visit friends or relatives, did not receive visitors at home and screened her calls so as not to talk on the phone. She read the Bible and the daily newspaper.

She testified that she was seeing Dr. Baker every six months. She was taking phenobarbital for her seizures, Tylenol III, Tagamet, Soma and Valium. At the time of her hearing she was no longer seeing a psychiatrist because she did not like psychiatrists.

She said she could sit or stand for about a half an hour, walk about one mile, lift about five pounds and reach with her right hand but not her left. Using both hands, she said she could perform fine manipulations such as buttoning a blouse. She said she could use her right arm for pushing and pulling and her right foot for using foot controls. However, she said she could not bend, squat, crawl or climb. McCormick testified that her right leg was "okay" but that her left leg had arthritis with swelling at the foot and knee and that she had broken her toe about four times in the past year. She said she could not raise her left shoulder, her left arm had no strength and she could not do her hair. At night, she was able to sleep for a few hours but then had to get up to sit in a chair for a while.

McCormick testified that her assembly job involved large assembly. She said she worked as a plant supervisor for four years and that this job required her to be on her feet all day and to do assembly line work while allowing workers to have restroom breaks. She said she could no longer perform this job because it required her to be on her feet all day. She described her clerical

job at Chrysler as a "gopher job" with no heavy lifting, some typing, filing and computer work. She testified that the position was discontinued by her employer. She said she could no longer perform this job even if it was available to her because the fingers in her left hand "won't work."

## IV.

### A.

McCormick contends that the ALJ's determination that she could perform her past relevant work was without substantial evidence given the combination of her mental and physical impairments. McCormick's first objection is that the award of worker's compensation benefits, disability benefits and disability pension benefits by her employer "establish[es] that the decision that Plaintiff can return to her past relevant work has no foundation in the record." At minimum, she says this constitutes strong evidence that the ALJ's determination was erroneous. Second, she argues that her foot pathology limits her to sit-stand jobs without kneeling or crouching. Third, she points to her psychiatric impairment as her most disabling factor. She relies on two psychiatric reports to show that the ALJ improperly completed the Psychiatric Review Technique Form (PRTF). Finally, McCormick argues that the ALJ's decision could not be supported by substantial evidence in the absence of expert vocational testimony. She seeks a remand to the ALJ for further medical and vocational assessment.

The Secretary responds that the ALJ's determination was supported by substantial evidence. She argues that McCormick's receipt of worker's compensation and pension disability benefits is not dispositive, and is not even strong evidence of McCormick's inability to perform her past relevant work because of differing qualification requirements and definitions. The Secretary argues that McCormick's testimony as to her activities indicates that her mental impairments do not severely restrict her daily life, social interaction, or ability to concentrate. Since McCormick testified as to the functional re-

quirements of her past relevant work, the Secretary argues that vocational expert testimony was unnecessary for the ALJ to determine whether McCormick could perform that work.

### B.

■ Judicial review of a social security disability benefits application is limited to determining whether the decision of the ALJ is supported by substantial evidence. Evidence supporting the ALJ's decision is substantial if a reasonable mind could accept it as supporting the challenged conclusion, even if evidence is present which could support a decision in the other direction. *Smith v. Secretary of HHS*, 893 F.2d 106, 108 (6th Cir.1989). The substantial evidence standard requires more than a scintilla of evidence, but less than a preponderance of evidence. *Brainard v. Secretary of HHS*, 889 F.2d 679 (6th Cir.1989).

### 1.

McCormick admits that eligibility for DIB is far more stringent than for worker's compensation benefits, disability benefits and disability pension benefits and, therefore, that she is not automatically entitled to DIB because she was awarded these other benefits. She argues, however, that the award of these other benefits is determinative of step four— it proves that she could not perform her past relevant work. She says that neither the plant physician nor plant management was able to place her within her restrictions.

■ Evidence of an impairment includes "decisions by any governmental or nongovernmental agency about whether [an individual is] disabled ..." 20 C.F.R. § 404.1512(b)(5). Such a decision is not determinative of disability. *McCann v. Califano*, 621 F.2d 829 (6th Cir.1980). However, this evidence is entitled to weight and should be considered. *Turpin v. Bowen*, 813 F.2d 165, 172 (8th Cir.1987) (previous employer's finding of disability necessary for claimant to retire on a disability pension is entitled to some weight).[3]

**3.** The circuits differ as to how much weight such decisions are entitled. *See Havas v. Bowen*, 804

■ The ALJ was not bound by the award of other benefits. Since evidence of receipt of worker's compensation or employer disability benefits is not determinative of disability under the Act, the Court is satisfied that it is not determinative of any of the steps necessary for a finding of disability, including step 4. McCormick admits that the requirements for DIB are more stringent and has presented no evidence to show that step 4 of those requirements is distinguishable in this regard.

■ Further, the reasons for the award of these other benefits are not known. The inability of General Motors to place McCormick within her restrictions does not necessarily mean that she could no longer perform her former jobs. Worker's compensation plans and corporate disability benefit programs must take into consideration factors agreed upon in union contracts and set forth in state legislation, such as the availability of a job within a certain locale. It is possible that the jobs into which she could be placed were either filled or, as with her clerical position, were otherwise unavailable.[4]

Also, there is nothing to suggest that the ALJ did not consider McCormick's receipt of these other benefits. While her award of these benefits was not specifically discussed in the ALJ's determination, the ALJ was clearly aware that McCormick was receiving these benefits. At the hearing, McCormick's counsel questioned her on her receipt of the benefits and the ALJ specifically asked her if she was required to file for them.

2. Mental and Physical Impairments

■ The ALJ's decision with regard to the limitations imposed upon McCormick by her mental and physical impairments was primarily based upon a lack of medical evidence indicating that she was unable to work and

the ALJ's assessment that McCormick was not credible in her testimony that she could not work. Because the ALJ has the opportunity to observe the claimant in person, "his conclusions with respect to credibility should not be discarded lightly and should be accorded deference." *Hardaway v. Secretary of HHS*, 823 F.2d 922, 928 (6th Cir.1987). While dismissals of claims for pain cannot be based solely on the ALJ's observations at the hearing, *Weaver v. Secretary of HHS*, 722 F.2d 310, 312 (6th Cir.1983), the ALJ's conclusions regarding credibility are given great weight. The ALJ simply must cite other evidence in addition to personal observation to support a denial of a claim for pain. *Id.*

a.

■ Here, the ALJ's conclusion as to McCormick's credibility, and his ultimate denial of her claim for back and leg pain and for pain in her left side limbs and hands in general, were not based merely on personal observation. In addition to his observation of McCormick, the ALJ specifically mentioned the conservative and limited medical treatment given to McCormick for her complaints and the low quantity doses of medication prescribed and taken by her for back pain as evidence supporting his finding that her complaints were not credible. The ALJ's conclusion as to McCormick's credibility was supported by her daily activities report and her testimony which revealed that she fixed meals for herself and her husband, did laundry, washed dishes, made her bed, drove a car occasionally, and did crossword puzzles. The evidence cited by the ALJ constitutes substantial evidence supporting the ALJ's conclusion as to McCormick's credibility regarding her claim. As for McCormick's seizure condition, this was admittedly controlled by medication.

F.2d 783, 786 n. 1 (2d Cir.1986) (some weight), *Kane v. Heckler*, 776 F.2d 1130, 1135 (3d Cir. 1985) (substantial weight), *Rodriguez v. Schweiker*, 640 F.2d 682, 686 (5th Cir.1981) (great weight), *Smith v. Secretary of HEW*, 587 F.2d 857, 862 (7th Cir.1978) (some weight), *Turpin, supra* (some weight), *Falcon v. Heckler*, 732 F.2d 827, 831 (11th Cir.1984) (great weight).

4. McCormick is misrepresenting the evidence when she says that the plant physician was unable to place her within her limitations. The plant physician's note to which McCormick refers only states the following:

> Dr. Oteqza will attempt to put pt. back to clerical position if possible. I would suggest following in terms of RTW:
> In addition to previous restrictions outlined by Dr. Baker: 1) a sit/stand at will and 2) no kneel and/or crouch, is recommended.

In light of the physical impairment evidence, McCormick's ability to perform her former supervisory role which required her to stand for eight hours is uncertain. Her activities do not indicate that she could stand for eight hours. Further, the plant physician determined that she should be given a sit/stand option. Although the ALJ found that her complaints of disabling pain were not credible, the fact remains that she broke or sprained her foot and toes numerous times in the year or two prior to the hearing.

■ However, the ALJ reasonably concluded that McCormick could perform her prior position as a clerical worker.[5] She testified that she can perform fine manipulations with two hands and Dr. Jones' report of December 16, 1991 found that she had 38 pounds of grasp strength in her right hand and ten pounds in her left hand, and that the range of motion in her hands and wrists was normal. Therefore, she can perform her position as a clerical worker which she testified required her to sit for about six hours in an eight hour day, to type, answer the telephone, file, use a computer and lift no more than ten pounds. This is entirely consistent with the restrictions recommended by the plant physician. There is no physical impairment evidence to the contrary, other than McCormick's own testimony and the reports of two other physicians which were discounted by the ALJ.[6]

#### b.

■ McCormick argues that "her most disabling factor is the psychiatric impairment of which her pain disorder is clearly a part." First, she argues that the ALJ's findings of no anhedonia, sleep disturbance or psycho-motor agitation are each contradicted by the reports of Drs. Tenbusch and Flurante. Second, she says that according to DSM–III–R, her score on the global assessment of functioning scale as found by Dr. Tenbusch shows a moderate difficulty in social or occupational functioning such as having few friends and conflicts with co-workers. Had the ALJ properly found and evaluated these symptoms, McCormick argues that the PRTF would have dictated a finding of disabled.

■ Individuals whose impairment does not meet or equal the level of severity of the mental disorder listings in 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00 may or may not have the residual functional capacity (RFC) which would enable them to engage in substantial gainful work activity.[7] The functional limitations assessed in determining an individual's RFC are: (1) activities of daily living, (2) social functioning, (3) deficiencies in concentration, and (4) episodes of deterioration or decompensation in work or work-like settings. *Id.* In addition to "A" criteria, McCormick must demonstrate two of the following "B" criteria to meet the required level of severity for an affective disorder, and three of the following for a personality disorder:

(1) Marked[8] restriction of activities of daily living;

(2) Marked difficulties in maintaining social functioning;

(3) Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere);

---

5. McCormick's prior position as an assembler was not described with enough detail to ascertain the functional abilities it required. McCormick only testified that the job involved large assembly.

6. The reports of Drs. Baker and McQuillan make blanket statements as to McCormick's inability to be gainfully employed. Neither doctor supports this conclusion with clinical findings. Dr. McQuillan indicated that he had neither complete medical records for McCormick nor access to her psychiatric records. While these reports could support a finding of disability, the possibility of differing conclusions being drawn from the medical evidence does not prevent the ALJ's finding from being supported by substantial evidence. *Smith, supra.*

7. While the magistrate judge incorrectly stated that meeting one of the listed disorders was a prerequisite to showing the required level of severity under 20 C.F.R. 404, Subpart P., App. 1 § 12.00, this was a harmless oversight given that the magistrate judge then examined the PRTF criteria.

8. "Marked" means more than moderate, but less than extreme.

(4) Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms ...

20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04 and 12.08.

The ALJ found that McCormick did not have a severe mental impairment. Employing the PRTF, the ALJ found that McCormick met the "A" criteria under § 12.04 of a depressive disorder and under § 12.08 of a mixed personality disorder. However, in terms of her functional limitations under the "B" criteria, the ALJ found that she had no restriction in activities of daily living relating to mental health problems, slight difficulty in maintaining social functioning, seldom deficiencies of concentration, persistence or pace and no episodes of deterioration or decompensation in work or work-like settings. Therefore, the ALJ concluded that McCormick's conditions did not constitute nonsevere mental health impairments which negatively impact on her ability to work in a vocationally significant manner. He specifically noted that McCormick had not sought or received sustained mental health treatment and that, while she suffered from episodic depression, these episodes were not an ongoing, severe problem since they were related to specific stressors as indicated by Dr. Bowdin. The Court will review each of the ALJ's findings under the "B" criteria.

1. Daily Life. McCormick's own testimony as to her daily activities and her ability to perform those activities both undermines her contention that her depression prevented her from working and supports the ALJ's decision. *Crisp v. Secretary of HHS,* 790 F.2d 450, 453 (6th Cir.1986).

2. Social Functioning. The ALJ found that McCormick's social functioning restriction was "slight," not "marked." This decision is supported by substantial evidence. McCormick testified that she vacationed to visit family once a year, went to church weekly and went to the beauty shop. Although she at one time reported that she did not have friends, she told Dr. Tenbusch that as far as she knew she got along "fine" with friends and coworkers. Also, in her July, 1992 daily activity report, she indicated that her children visited her weekly.

■■ DSM–III–R's classification of McCormick's score of 60 on the global assessment functioning scale as indicative of a moderate difficulty in social or occupational functioning such as having few friends and conflicts with co-workers is inconsequential. A moderate difficulty is not sufficient under the Act. Rather, the difficulty must be marked.[9]

Also, although it is true that Dr. Flurante found that McCormick exhibited anhedonia, sleep disturbance and psychomotor agitation or retardation and that these criteria were not checked off on the PRFT by the ALJ, these are the "A" criteria under § 12.04 and the ALJ decided that the "A" criteria were met.

3. Concentration. The ALJ found that McCormick's abilities to concentrate and remember were "seldom" deficient. This is supported by the psychologist's reports and by McCormick's own testimony that she had no problems with her memory or concentration.

4. Episodes of Deterioration at Work. The ALJ found no evidence that McCormick ever experienced deterioration or decompensation at work or in a work-like setting. There is no such evidence in the record.

Therefore, the ALJ reasonably concluded that the "B" criteria were not met. The ALJ's determination that McCormick's mental impairments were not severe and would not prevent her from performing her past relevant work was supported by substantial evidence.

**4.**

■■ Vocational testimony was not necessary to determine McCormick's ability to perform her former clerical position because she testified as to the requirements of the position. Based on McCormick's own description of the job, the ALJ found that she had the ability to perform that job and that

**9.** *See, supra* n. 8.

she did not have a severe mental impairment which would prevent her from doing so.

Because the ALJ's decision that McCormick could perform her past relevant work despite her physical and mental impairments is supported by substantial evidence, McCormick is not disabled under the Act. 20 C.F.R. § 404.1520(e). Therefore, vocational expert testimony as to the availability of other jobs in the community also is not required. *Orrick v. Sullivan,* 966 F.2d 368, 372 (8th Cir.1992).

### V.

For the reasons stated, McCormick's motion for summary judgment is DENIED and the Secretary's motion for summary judgment is GRANTED.

SO ORDERED.