Rex D. RICHTER, Plaintiff,

v.

Shirley S. CHATER, Commissioner
of Social Security,[1] Defendant.

No. 95–4004–SAC.

United States District Court,
D. Kansas.

Aug. 24, 1995.

___

1. Effective March 31, 1995, the functions of the Secretary of Health and Human Services in social security cases were transferred to the Commissioner of Social Security. P.L. No. 103–296. The court hereby substitutes the Commissioner for the Secretary in the caption of this case. In the body of the order, however, the court will still refer to the Secretary who was the acting party in the underlying proceedings.

Patrick H. Donahue, Kansas Legal Services, Inc., Topeka, KS for plaintiff Rex D. Richter.

D. Brad Bailey, Office of United States Attorney, Topeka, KS, for defendant HHS Secretary, Donna Shalala.

## MEMORANDUM AND ORDER

CROW, District Judge.

This is an action to review the final decision of the Secretary of Health Human Services [42 U.S.C. § 405(g) ] denying the plaintiff Rex D. Richter's applications for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act. The case is ripe for decision on the plaintiff's motion for summary reversal or remand (Dk. 9) and on the Secretary's brief in opposition (Dk. 10).[2]

### PROCEDURAL HISTORY

Rex Richter applied for disability benefits and supplemental security income. Both applications were denied initially and on reconsideration. Following the hearing held July 15, 1992, the ALJ issued a decision on October 29, 1992, unfavorable to Richter. The Appeals Council vacated the ALJ's decision and remanded the case for further proceedings. After conducting a supplemental hearing, the ALJ issued a second decision on December 10, 1993, again finding that Richter was not under a "disability" at any time through the date of the ALJ's decision. The

---

**2.** The plaintiff appears to have followed D.Kan. Rule 503 which provides for the filing of "an appropriate dispositive motion and memorandum" for a social security appeal. The Tenth Circuit in *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579 n. 29 (10th Cir.1994), disapproved this rule and, specifically, the motion practice under it. The court is in the process of changing D.Kan.Rule 503 to comply with the holding in *Olenhouse* and to conform with Fed. R.App.P. 15. For purposes of the present appeal, the court attaches no legal significance to the dispositive motion that accompanies the plaintiff's memorandum. In recognition of *Olenhouse*, the Secretary filed only a brief. The court intends to follow the well-established standard of review for social security appeals and to rely only on what evidence is found within the administrative record.

Appeals Council denied Richter's request for review on November 8, 1994. Thus, the ALJ's decision stands as the Secretary's final decision.

## STANDARD OF REVIEW

■ The court's standard of review is set forth at 42 U.S.C. § 405(g), which provides that "the finding of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is more than a scintilla and is that evidence which a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401–02, 91 S.Ct. 1420, 1427–28, 28 L.Ed.2d 842 (1971); *Ray v. Bowen,* 865 F.2d 222, 224 (10th Cir.1989). "A finding of ' "no substantial evidence" will be found only where there is a "conspicuous absence of credible choices" or "no contrary medical evidence." ' " *Trimiar v. Sullivan,* 966 F.2d 1326, 1328 (10th Cir.1992) (quoting *Hames v. Heckler,* 707 F.2d 162, 164 (5th Cir.1983) (quoting *Hemphill v. Weinberger,* 483 F.2d 1137 (5th Cir.1973)). "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala,* 44 F.3d 855, 858 (10th Cir.1994) (citation omitted).

■ The court's review also extends to determining whether the Secretary applied the correct legal standards. *Washington v. Shalala,* 37 F.3d 1437, 1439 (10th Cir.1994). Besides the lack of substantial evidence, reversal may be appropriate when the Secretary uses the wrong legal standards or the Secretary fails to demonstrate reliance on the correct legal standards. *Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir.1994).

■ The court's duty to assess whether substantial evidence exists:

> "is not merely a quantitative exercise. Evidence is not substantial 'if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.' "

*Gossett v. Bowen,* 862 F.2d 802, 805 (10th Cir.1988) (quoting *Fulton v. Heckler,* 760 F.2d 1052, 1055 (10th Cir.1985)). The court is not to reweigh the evidence or substitute its judgment for the Secretary's. *Glass v. Shalala,* 43 F.3d at 1395. The court typically defers to the ALJ on issues of witness credibility. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1498 (10th Cir.1992). The courts, however, do not mechanically accept the Secretary's findings. *Claassen v. Heckler,* 600 F.Supp. 1507, 1509 (D.Kan.1985); *see Ehrhart v. Secretary of Health & Human Services,* 969 F.2d 534, 538 (7th Cir.1992) ("By the same token, we must do more than merely rubber stamp the decisions of the Secretary." (citation omitted)). Nor will the findings be affirmed by isolating facts and labelling them substantial evidence, as the court must scrutinize the entire record in determining whether the Secretary's conclusions are rational. *Holloway v. Heckler,* 607 F.Supp. 71, 72 (D.Kan.1985). " 'We examine the record as a whole, including whatever in the record fairly detracts from the weight of the Secretary's decision and, on that basis determine if the substantiality of the evidence test has been met.' " *Glenn v. Shalala,* 21 F.3d 983, 984 (10th Cir.1994) (quoting *Casias v. Secretary of Health & Human Services,* 933 F.2d 799, 800–01 (10th Cir.1991)); *see Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951).

■ The qualifications for disability insurance benefits under the Social Security Act are that the claimant meets the insured status requirements, is less than 65 years of age, and is under a "disability." *Flint v. Sullivan,* 951 F.2d 264, 267 (10th Cir.1991). An individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 423(d)(2)(A). The claimant has the burden of proving a disability that prevents him from engaging in his prior work for a continuous period of twelve months. *Trimiar,* 966 F.2d at 1329. The burden then shifts to the Secretary to show that the claimant retains the ability to do other work activity and that jobs the claimant could perform exist in the national economy. *Sorenson v. Bowen,* 888 F.2d 706, 710 (10th Cir. 1989). The Secretary satisfies this burden if

substantial evidence supports it. *Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993).

For evaluating a claim of disability, the Secretary has developed a five-step sequential process. *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 2290–91, 96 L.Ed.2d 119 (1987). This process comes to an end if at any point the Secretary determines the claimant is disabled or not. *Gossett,* 862 F.2d at 805. Step one is whether the claimant is currently engaged in substantial gainful activity. If not, the fact finder next considers whether "the claimant has a medically severe impairment or combination of impairments." *Yuckert,* 482 U.S. at 141, 107 S.Ct. at 2291. Step three entails determining whether the impairment is equivalent to one of a number of impairments found in the "Listing of Impairments," 20 C.F.R. Part 404, Subpt. P, App. 1, which the Secretary acknowledges are so severe as to preclude substantial gainful activity. If no equivalency, the claimant must show that because of the impairment he is unable to perform his past work. The final step is to determine whether the claimant has the residual functional capacity (RFC) to perform other work available in the national economy, considering such additional factors as age, education, and past work experience. *See Williams v. Bowen,* 844 F.2d 748, 750–52 (10th Cir.1988).

## ALJ'S DECISION

In his order of December 10, 1993, the ALJ made the following findings:

1. Claimant met the special earnings requirements of the Act on July 12, 1990, the date claimant stated he became unable to work, and continues to meet them through the date of this decision.

2. Claimant has not engaged in substantial gainful activity at any time since July 12, 1990.

3. The medical evidence establishes that claimant has peripheral vascular disease in the lower extremities; is status post head trauma with a craniotomy in 1966 and residual seizure disorder which is not severe; has chronic obstructive pulmonary disease with normal pulmonary function studies which is not severe; a history of a left heel fracture with no significant residual severe impairment; has a history of burns in 1970 which did not preclude work thereafter and do not currently preclude work activity; and complaints of organicity which are not corroborated by substantial evidence of record and he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. Claimant's testimony as to his inability to perform his past relevant work as he performed it is found to be credible but no (sic) controlling in as much as he has not provided substantial evidence that he could perform such work as it is generally performed in the national economy.

5. Claimant has at all time pertinent herein retained the residual functional capacity to perform at least a range of sedentary work as that term is defined in the regulations at 20 CFR 404.1567 where he has the ability to sit and stand optionally through an eight-hour work day.

6. Claimant's past relevant work as a security company dispatcher, as that job is generally performed in the national economy, was not precluded by the above limitations.

7. Claimant's impairments, symptoms, and resulting residual functional capacity do not prevent him from performing his past relevant work as a security company dispatcher.

8. Claimant was not under a "disability" as defined in the Social Security Act, as amended, at any time through the date of this decision.

(Tr. 21–22).

■ The ALJ here made his decision at step four of the sequential evaluation process. At this step, the relevant inquiry is whether Richter's physical and/or mental impairments prevent him from performing his past relevant work. *Andrade v. Secretary of Health and Human Services,* 985 F.2d 1045, 1047 (10th Cir.1993). Richter is not considered disabled under the Social Security Act if

he is able to return to his past relevant work. *Id.* at 1050. Richter has the burden of showing that he is unable to perform that work. *Henrie v. United States Department of Health and Human Services,* 13 F.3d 359, 360 (10th Cir.1993). The ALJ determined from the record that Richter's impairments do not prevent him from returning to his past relevant work as a security company dispatcher.

## SUMMARY OF ARGUMENTS

Richter argues the ALJ's step four finding is contradicted by the medical evidence, the plaintiff's testimony, and the finding of total disability by the Veteran's Administration ("VA"). The ALJ's hypothetical was based on several erroneous assumptions. The ALJ failed to give any weight to the VA's disability finding. The ALJ did not evaluate Richter's subjective complaints in accordance with Social Security Ruling 88–13. The ALJ did not properly evaluate Richter's subjective complaints of pain. The ALJ on remand failed to give additional rational for the rating of Richter's mental impairment. The ALJ abused his discretion in obtaining a new vocational expert for the supplemental hearing.

## FACTS

Richter was born on April 5, 1932, and graduated from Pittsburg State University in 1956 with a degree in business administration. His college education was interrupted by two years of military service with the United States Army between 1952 to 1954. From 1978 to 1990, Richter's principal occupation was tending bar.

In June of 1966, Richter fell on a concrete drive fracturing his skull. He was diagnosed with an "[a]cute right occipital temporal extradural hematoma from laceration [to] his middle meningeal artery" and a "[r]ight temporo-occipital skull fracture." (Tr. 194). To evacuate the hematoma, Richter underwent a craniotomy in 1966.

In June 1970, Richter was burned when boiling water was spilled on him. He was hospitalized with first and second degree burns over fifty percent of his body.

In November of 1971, Richter fell eight feet from a ladder landing on his left foot and injuring his heel. He went to the emergency room and was diagnosed with epilepsy and a fracture of his left heel. He was discharged from the hospital two days later with crutches for his fractured heel and medication for his epilepsy.

The treatment notes from the VA Hospital show that Richter received routine medical care and also treatment for more serious conditions. In February of 1990, physicians diagnosed Richter with peripheral vascular disease. Apparently because of concerns raised during a visual acuity examination, a CT scan was done in April of 1990 with the following report:

> There is mild prominence of the ventricular system, especially the left lateral ventricle. Residuals of craniotomy are noted in the left posterior parietal region. There is irregular decreased attenuation in the occipital lobe on the left side, probably the residuals of the old trauma, the old epidural hemorrhage and also post surgical changes. There is no evidence of infarction involving the left temporal lobe or any other area. There is no mass effect.

(Tr. 163). The VA physicians continued to monitor the deteriorating condition of Richter's peripheral vascular disease. In November of 1990, the physician's notes show Richter complained of an aching pain in his left lateral thigh upon walking approximately five hundred feet. Richter told physicians that the pain was relieved with rest. The physicians saw no ulcers or sites of claudication.

In June of 1991, Richter's vascular disease had deteriorated to the point that he complained of bilateral claudication after one hundred feet of walking with the left thigh pain more than the right thigh. An angiography examination showed "complete occlusion of the left common iliac artery" and "extensive atherosclerotic changes of the right common iliac and external iliac arteries." (Tr. 310). On July 5, 1991, Dr. Larson at the VA Hospital performed an "[a]orto-right iliac-left femoral bypass." (Tr. 312). He was discharged on July 13, 1991, with several medications. In a follow-up visit approximately one month after his surgery, Richter told the physician that he had "no complaints—able to ambulate well—4 + blocks." (Tr. 283). A month later, Richter

told another VA physician that his legs were "somewhat better" but that he still has "some claudication in right calf." (Tr. 282). The record does not include treatment notes or other documents concerning his visits and care at the VA Hospital after September of 1991.

Richter was evaluated by a consulting physician in January of 1991. The conclusions stated in the medical report were a history of subdural hematoma and peripheral vascular disease. (Tr. 155–56). The examination was otherwise unremarkable.

In February of 1992, Richter was evaluated by a consulting psychologist, Avner Stern. Stern observed that Richter's speech was "a bit slurred and labored" and that he had "noticeable word finding difficulties." (Tr. 48). Stern further observed that Richter's "[s]hort term memory was problematic" and that he appeared "moderately forgetful." (Tr. 48). Stern thought Richter's problems indicated an organic impairment and suggested further memory testing.

In August of 1992, Richter was evaluated by another consulting psychologist, Stanley Mintz. Richter's results under the Wechsler Adult Intelligence Scale–Revised and the Bender–Gestalt Test showed that he functions within the low average intellectual range. Mintz opined that the test results were "not suggestive of organicity." (Tr. 319). Mintz further concluded that Richter appeared "able to understand simple and intermediate instructions." (Tr. 320). In his recorded report, Mintz more fully explained his conclusions:

> MENTAL STATUS: ... He gives, at times, a confusing account of his social history, and at times he does not appear forthcoming, or he simply confuses and does not remember events adequately. He functions within the low average intellectual range, with similar levels of memory functioning. He exhibits deficient immediate attention span. He is able to recite four digits forward and three digits backward.
> SUMMARY: ... He appears able to understand simple and intermediate instructions. His concentration capacity tends to be variable, most likely adequate for a simple, repetitive task for a four-hour or eight-hour time span....

(Tr. 326–27). Mintz completed a form assessing Richter's mental ability to do work-related activities. (Tr. 321–23).

At the hearing held on November 16, 1993, Richter testified that he lives alone in a four-bedroom house and that he drives a car. Richter's last full-time job was in 1987 when he worked as a dispatcher for a security company. Richter's primary responsibilities as a dispatcher were to monitor security guard attendance and to locate missing guards or replace them at the assigned sites. Richter accomplished this work over the telephone. He was also asked to read and prepare reports. At the time that he did this job, Richter did not use a computer or any other technical equipment other than an ordinary telephone. Richter worked twenty-two months as a dispatcher before he was fired allegedly for being rude to a client. After his dispatcher position, Richter worked several part-time jobs as a dishwasher, bartender, library attendant and census enumerator.

Richter attributed his circulation problems in the lower extremities to his work as a dispatcher. The constant sitting caused his feet to go numb and later his legs would hurt with walking. Richter testified that he last worked in July of 1990 and was then disabled due to the leg pain with walking.

Richter testified that the operation in 1991 improved his circulatory condition, but he still experiences pain in both legs when he walks more than one block and he cannot stand comfortably for more than fifteen minutes. When asked whether he was able to perform his former job of a security dispatcher, Richter said he could not because of his circulation problems. Richter denied that his dispatcher duties could be done while occasionally standing, as he was frequently talking on the phone and simultaneously writing information into logs. (Tr. 404). Richter did not know if his problem with forgetting things would prevent him from doing his former job as it existed in 1987. Richter further expressed doubts whether he could do the job as it may exist today if he was expected to learn or to perform new duties.

Richter described concentration problems that he first noticed several years ago. He

said he was easily distracted and that his attention often shifts sporadically. Richter displayed during his testimony some difficulty understanding basic questions and keeping his answers focused. In February of 1991, a social security claims representative noted that Richter had "bumped into a screen when coming to interview desk. Seemed to be very tired and somewhat depressed. He tended to almost doze off during interview. He had trouble concentrating." (Tr. 150).

The ALJ retained a practicing physician, Dr. Lynn DeMarco, to review Richter's medical exhibits and to answer certain questions. Dr. DeMarco diagnosed Richter's current condition as peripheral vascular disease, a seizure disorder possibly secondary to the epidural hematoma in 1966, and chronic obstructive pulmonary disease. Dr. DeMarco opined that Richter's pulmonary disease was not severe as evidenced by the pulmonary function studies. Based on the lack of recurrent seizures, Dr. DeMarco further believed that the seizure disorder was not severe. Dr. DeMarco considered the peripheral vascular disease "the most significant condition" for Richter and he read the record as showing that the surgery was "definitely successful in improving the circulation." (Tr. 421). The ALJ then asked Dr. DeMarco to assess Richter's residual functional capacity. Dr. DeMarco would not restrict sitting capacity because Richter had not complained of any rest pain. Dr. DeMarco would place no standing restrictions believing Richter, after the surgery, could walk one to two blocks without stopping due to pain. Based on the two psychologists' reports and the VA records, Dr. DeMarco opined that "Richter does not have severe organic brain disease, for sure, and I'd wonder if he had much organic brain disease at all." (Tr. 423). Dr. DeMarco further testified that the medical records did not show that Richter suffered from a significant concentration deficit, easy distractibility, or a severe memory deficit. (Tr. 423–24). Dr. DeMarco noted that the medical records do not show that Richter complained of forgetfulness. Dr. DeMarco later explained that his definition of "severe" was "a situation that significantly compromises a particular organ function." (Tr. 430).

At the first hearing, the ALJ called Mary Tittertington as the vocational expert. She testified that the dispatcher job was sedentary and semi-skilled. When asked if the dispatcher job allowed for a sit-stand option, she said that in the past such positions allowed for the dispatcher to sit or stand but current dispatcher positions "are very few that allow it [sit-stand option] because of the computer terminals and the way they are." (Tr. 476). She also questioned whether a dispatcher could stand and do the job if there were extensive writing demands. (Tr. 477). The ALJ asked the vocational expert:

If I changed only the mental standpoint, ... his attention span and cognitive abilities are somewhat impacted upon and he would be out of focus, unable to concentrate completely and not always remember well, especially when he is not totally focused on the object at hand. And in an eight hour day, because of the inability to totally focus on any particular object at hand, that might happen several times. If that were hypothetically accurate, would you feel he could return in an efficient manner to his past, relevant dispatcher type position?

A. No.

Q. Why not?

A. The dispatcher has to be alert, has to be able to communicate in, I think, efficient, clear fashion, has to be able to concentrate on the work and has to be able to remember, certainly.

(Tr. 479). She later offered that a person with average performance abilities in concentration and memory could be a dispatcher. (Tr. 486).

At the second hearing, the ALJ called a different vocational expert, Patty Perdaris. She testified that dispatcher was classified as sedentary and unskilled work that seventy to eighty percent of the dispatcher jobs allowed for a sit-stand option. (Tr. 433). She described dispatcher jobs as "unskilled entry level positions which require answering a telephone, simple reports." (tr. 438). Based on the hypothetical questions asked of her, Ms. Perdaris testified that Richter could return to the past relevant dispatcher position. (Tr. 434–35).

**1538**

## MERITS

 Richter argues the ALJ did not consider that he has received a full VA's disability pension since October of 1991. The evidence of record regarding the VA disability pension is scant and incomplete. Exhibit 40 simply confirms that Richter receives a "non-service-connected disability pension" and the monthly amount of his payments for 1991 and 1992. (Tr. 351–52). At the July 1992 hearing, the ALJ asked about the amount of Richter's VA disability pension and then inquired:

Q. Do you know what your VA disability is based on? What problem they found that you had? Was it a peripheral vascular disease?

A. Probably that, mostly that, probably, and—I don't know what all they based it on.

(Tr. 459). At the November 1993 hearing, the ALJ again inquired of Richter's sources of income and learned that since October of 1991 Richter has received a monthly VA disability pension. The ALJ did not follow up with any inquiries or requests for additional information about the VA disability proceedings.

In his ten-page written decision of December 10, 1993, the ALJ mentions Richter's VA disability pension only one time:

With regard to the above, claimant testified that he has a driver's license and is able to drive a motor vehicle. He testified that he receives a disability pension from the Depart (sic) of Veteran's Affairs effective October 1991. Prior to receiving this pension, claimant testified that he did receive public assistance. With regard to his impairments, claimant testified that he has been disabled since July 1990 and could hardly walk due to leg circulation.

(Tr. 15). In his first decision of October 29, 1992, the VA disability pension is never mentioned. From what he wrote, the ALJ treated the VA disability pension as nothing more than a source of income on which the plaintiff testified. Neither of his decisions show that he considered the disability pension to be a disability finding by the VA or that he accorded the VA disability finding any weight. The Appeals Council in denying Richter's request for review rejected his argument regarding the VA disability finding:

The Administrative Law Judge advised your representative at the hearing that it was irrelevant that you were found disabled by the Veterans Administration. According to section 404.1504 of Social Security Administration Regulations No. 4 (20 CFR 404.1504), a decision by any other governmental agency about whether you are disabled is based on its rules and it [sic] not our decision about whether you are disabled. We must make a disability determination based on Social Security Law.

(Tr. 4).

 " 'Although findings by other agencies are not binding on the Secretary, they are entitled to weight and must be considered.' " *Baca v. Department of Health and Human Services,* 5 F.3d 476, 480 (10th Cir. 1993) (quoting *Fowler v. Califano,* 596 F.2d 600, 603 (3rd Cir.1979)). The circuits differ over how much weight to afford other agency findings. *McCormick v. Shalala,* 872 F.Supp. 392, 398 n. 3 (E.D.Mich.1994) (citing *See Havas v. Bowen,* 804 F.2d 783, 786 n. 1 (2nd Cir.1986) (some weight), *Kane v. Heckler,* 776 F.2d 1130, 1135 (3rd Cir.1985) (substantial weight), *Rodriguez v. Schweiker,* 640 F.2d 682, 686 (5th Cir.1981) (great weight), *Smith v. Secretary of HEW,* 587 F.2d 857, 862 (7th Cir.1978), *Falcon v. Heckler,* 732 F.2d 827, 831 (11th Cir.1984) (great weight)). In *Mandrell v. Weinberger,* 511 F.2d 1102, 1103 (10th Cir.1975), the Tenth Circuit made clear the VA's finding of disability was not controlling on the Social Security Administration but avoided saying how much weight should be given the finding. The Third Circuit's decision in *Fowler,* which the Tenth Circuit cited in *Baca,* noted the rule that a VA disability finding is "critically relevant and material in a parallel Social Security case." *Fowler,* 596 F.2d at 603 (citations omitted). Indeed, the Third Circuit in *Lewis v. Califano,* 616 F.2d 73, 76 (3rd Cir.1980), held that another agency's finding that the claimant cannot work was entitled to substantial weight and sustained the claimant's initial burden of proving a disability. *See Burton v. Bowen,* 704 F.Supp. 599, 602 (E.D.Pa.1989). Though it is not clear what

evidentiary weight other agency findings carry in the Tenth Circuit, it is beyond dispute that they must be considered and given some weight. *See, e.g., Thomas v. Weinberger*, 398 F.Supp. 1034, 1036 (D.Kan.1975) (100% disability benefits from VA is "persuasive" evidence "of the fact of disability.").

A passing reference to another agency's disability finding or a perfunctory rejection of it will not suffice. "A VA rating of 100% disability should ... [be] closely scrutinized by the ALJ." *Rodriguez v. Schweiker*, 640 F.2d 682, 686 (5th Cir.1981). The ALJ's passing reference to the VA disability pension as a source of income does not show that he considered the disability finding in his evaluation of the evidence. Nor does it indicate what weight he gave to this "important fact." *Thomas*, 398 F.Supp. at 1036. The court must remand the case for an application of the proper legal standard with respect to this evidence. *See Hogard v. Sullivan*, 733 F.Supp. 1465, 1469 (M.D.Fla.1990). In addition, the ALJ did not attempt to discover the factual basis and the medical evidence on which the VA's finding of disability was made and the pension was awarded.[3] On remand, the Commissioner "must make every reasonable effort to obtain the records from the VA." *Baca*, 5 F.3d at 480. The court would expect that on remand the Commissioner will consider whether this evidence in combination with Richter's testimony, the other medical records of physical impairments, and the evidence of Richter's memory and concentration problems amount to a prima facie showing that Richter is unable to return to his former work as a security dispatcher.

Because the court must remand the case, the court will address Richter's other arguments summarily. The court finds no error in the hypothetical questions asked of the vocational expert.[4] Though Dr. DeMarco's definition of "severe" may not precisely coincide with that used in social security cases, his testimony regarding the different impairments is generally consistent with the latter meaning of "severe." The court agrees with Richter that the ALJ's evaluation of his pain allegations is incomplete and is based on isolated readings of the medical records. The physician's notes from his September 1991 visit to the VA clinic mention a complaint of claudication in his right calf, and other complaints of pain and edema. This is the most recent medical evidence from Richt-

---

**3.** In every social security case, the ALJ has a basic duty to see that an adequate record is developed on which to decide the issues raised. *Henrie v. United States Dept. of Health and Human Services*, 13 F.3d 359, 360–61 (10th Cir. 1993); *Baca v. Department of Health and Human Services*, 5 F.3d 476, 479–80 (10th Cir.1993) ("basic duty of inquiry to fully and fairly develop the record as to material issues.") (citations omitted). The ALJ's duty "is one of inquiry, ensuring that ... [he] is informed about 'facts relevant to his decision and learns the claimant's own version of those facts.'" *Id.* at 361 (quoting *Dixon v. Heckler*, 811 F.2d 506, 510 (10th Cir. 1987)). This duty exists whether or not the claimant is represented by counsel. *Henrie*, 13 F.3d at 361. This duty is particularly important when it comes to determining the claimant's ability to do his past relevant work:

"'The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision. Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit.'"

*Nimick v. Secretary of Health and Human Services*, 887 F.2d 864, 866 (8th Cir.1989) (quoting

Soc.Sec.Ruling No. 82–62, Soc.Sec.Rep. 809, 812 (West 1983)).

**4.** "'Testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision.'" *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir.1991) (quoting *Ekeland v. Bowen*, 899 F.2d 719, 722 (8th Cir.1990)). The ALJ need include in his hypothetical questions only those alleged impairments that the ALJ accepts as true. *See Talley v. Sullivan*, 908 F.2d 585, 588 (10th Cir. 1990). The ALJ properly relied on the vocational expert's testimony in describing the security dispatcher position as unskilled and sedentary. The ALJ also properly relied on Mintz's medical assessment of mental impairment in describing Richter's ability to concentrate and follow instructions. Richter cites no authority, and the court knows of none, that would require the ALJ to include in the hypothetical the fact that Richter receives a VA disability pension. This fact is evidence of an impairment, but it is not an impairment itself under the Act. Finally, even assuming the first hypothetical question was phrased prejudicially, the ALJ followed it with another question that relied on Mintz's medical assessment.

er's treating physicians found in the record.[5] On remand, the Commissioner should obtain and review more recent records for the presence or absence of pain complaints. Richter does not show where the ALJ failed to follow Soc. Sec. Ruling 85–16 (1985) in evaluating Richter's mental impairment. The Appeals Council did not require the ALJ to take supplemental evidence regarding this impairment on remand. Finally, the court has reviewed provisions from the manual for the Office of Hearings and Appeals for the Social Security Administration ("Hallex"). Because of the conflicting testimony that the two vocational experts provided, because the claimant is entitled to a fair and open proceeding and because judicial review is impossible without an adequate record, the court asks that the Commissioner on remand state for the record the ALJ's reasons for not using the same vocational expert in the supplemental hearing and for not providing the new expert with a transcript or summary of prior expert's testimony.

IT IS THEREFORE ORDERED that the plaintiff's motion for summary reversal or remand (Dk. 9) is granted to the extent that the court remands the case for additional proceedings consistent with this opinion.

---

**5.** In April of 1992, Richter completed a social security form disclosing recent medical treatment. (Tr. 183). He mentions treatment at the VA medical center on March 19, 1992. After the Appeal Council remanded the case, the record does not show that any effort was made to obtain more recent treatment notes or records from the VA medical center.