**John W. EASON, Plaintiff,**

v.

**Shirley S. CHATER, Commissioner of Social Security, Defendant.**

**Civil No. 93–921 JC/LFG.**

United States District Court, D. New Mexico.

Jan. 12, 1996.

---

**1558**

Gary J. Martone, Albuquerque, NM, for John W. Eason.

Ronald F. Ross, U.S. Attorney's Office, D. New Mexico, Albuquerque, NM, for Department of Health and Human Services.

### ORDER ADOPTING MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION

CONWAY, Chief Judge.

THIS MATTER is before the Court on the Magistrate Judge's Analysis and Recommended Disposition filed November 22, 1995. No objections have been filed. The Court accepts the analysis and recommended disposition.

IT IS HEREBY ORDERED that the analysis and recommended disposition of the United States Magistrate Judge are adopted by the Court.

IT IS FURTHER ORDERED that Plaintiff's motion to remand is granted and the matter is remanded to the Commissioner for further proceedings consistent with the analysis and recommended disposition.

JOHN W. EASON, Plaintiff,

vs.

SHIRLEY S. CHATER, Commissioner of Social Security,[1] Defendant.

Nov. 22, 1995.

### MAGISTRATE JUDGE'S ANALYSIS AND RECOMMENDED DISPOSITION [2]

GARCIA, United States Magistrate Judge.

Plaintiff invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Secretary of Health and Human Services ("Secretary"). The Secretary determined that Plaintiff John W. Eason ("Eason") was not eligible for disability insurance benefits ("DIB") or for Supplemental Security Income ("SSI") benefits. Eason moves this Court for an order remanding for a rehearing. This Court reviews the Secretary's decision to determine whether the Secretary's findings are supported by substantial evidence and whether the Secretary applied correct legal standards in making her findings. *Castellano v. Secretary of Health and Human Services,* 26 F.3d 1027, 1028 (10th Cir.1994).

### Administrative History

Eason applied for SSI and for DIB in May 1991, alleging that since June 15, 1987, he has been unable to work due to musculoskeletal problems and seizures. Eason's applications were denied at the administrative level, both initially and upon reconsideration. Ea-

---

1. As of March 31, 1995, the functions of the Secretary of Health and Human Services in social security cases were transferred to the Commissioner of Social Security. P.L. No. 103–296. Accordingly, Shirley S. Chater, Commissioner of Social Security is substituted for Donna E. Shalala, Secretary of Health and Human Services. Although the substitution has been made in the caption, in the text of the analysis the Court will continue to refer to the Secretary because she was the appropriate party at the time benefits were denied.

2. Within ten (10) days after a party is served with a copy of the legal analysis and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such analysis and recommendations. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the analysis and recommendations. If no objections are filed, no appellate review will be allowed.

son requested and received a *de novo* review before an Administrative Law Judge ("ALJ"). A hearing was held January 13, 1993, at which Eason and his attorney, Gary Martone, appeared. The ALJ found Eason was not disabled within the meaning of the Social Security Act and denied his benefit requests. The Appeals Council denied Eason's requests for review. The decision of the ALJ, therefore, became the final decision of the Secretary for purposes of judicial review.[3]

## Statement of Facts

Eason alleges disability since June 15, 1987 due to musculoskeletal problems and seizures. At the time of the administrative hearing, Eason was fifty-six years old. Eason completed the tenth grade. His past relevant work experience has been as a heavy equipment operator and mechanic.

## Testimony

Eason testified that he has been experiencing seizures for the past three years. (Transcript of Record "TR" 41). He described how he feels during a seizure. (TR 39–40). He compared it to having "something pop in your head" and when he comes out of it, he feels as if he is in a new world and in a state of confusion. *Id.* Eason also described smelling a horrible odor. Eason testified he has seizures several times a day. Eason stated he takes Dilantin[4] and that the medication has helped. (TR 40). He said that he takes his medicine most of the time, but when he forgets whether he took the requisite dosage, he does not take the Dilantin. (TR 41).

Eason also testified about how he feels when he has panic attacks. He said that his heart races and he gets a "scary" feeling in his stomach. (TR 43–44). Eason estimated that he has these attacks two or three times a week and that each attack lasts several minutes. *Id.* Eason also stated that he occasionally hears voices and sees somebody walking next to him. (TR 44).

Eason described his physical limitations as follows. He stated that he had no problems sitting; he could walk about a quarter mile; and he has problems standing due to pain in his left leg. Eason uses crutches and a cane to walk. (TR 41–42).

Additionally, Eason testified about his daily activities and interests. He stated that he spends the day watching television and that he also accompanies his friend on her errands. Eason stated that he has problems sleeping and feels depressed. (TR 45). Eason receives disability benefits from the State of New Mexico. (TR 37, 172).

## Medical Evidence

The first series of medical records dated May 23, 1991 through October 4, 1991, are from the University of Texas Medical Hospital located in Galveston, Texas. (TR 116–128). Eason was seen at the neurology clinic in May, for an evaluation of olfactory hallucination. The notes reflect that Eason drinks three beers daily and goes on an occasional binge. The evaluator assessed that Eason may have partial convulsive seizures, incomplete anosmia.[5] Eason was given Tegretol[6] to control his seizures. (TR 123–124).

Eason was seen again on June 6, 1991 complaining of a rash, a side effect of Tegretol. The record indicates that Eason did not have a telephone and was difficult to contact. (TR 122). Eason called on July 27, 1991 to advise the he had run out of Tegretol and that he felt the generic inferior. (TR 128). Dr. Pay–Zen Cheng saw Eason on July 23, 1991. (TR 129–136). Eason told Cheng his seizures began after he had a concussion in 1978 and that he drank a six pack of beer daily. Dr. Cheng recorded that he smelt

---

3. The decision of the ALJ is attached to this Analysis and Recommended Disposition as Exhibit A.

4. Dilantin is indicated for the control of generalized tonic-clonic (grand mal) and complex partial (psychomotor, temporal lobe) seizures and prevention and treatment of seizures occurring during or following neurosurgery. *1995 Physicians' Desk Reference*, 49th Edition, p. 1832.

5. Anosmia is olfactory anesthesia. *Stedman's Medical Dictionary*, 25th Edition Illustrated (1990), p. 90.

6. Tegretol is indicated for use as an anticonvulsant drug and for treatment of the pain associated with true trigeminal neuralgia. *1995 Physicians' Desk Reference*, 49th Edition, p. 603–604.

alcohol on Eason's breath. Dr. Cheng opined that Eason had low back strain, gynecomastia[7] and a history of alcohol abuse. An x-ray taken at this time of Eason's hip showed no abnormality. (TR 137). On August 14, 1991, an MRI was taken of Eason's brain and stem. The MRI showed minimal deep white matter infarctions in both cerebral hemispheres and minimal to moderate cerebral atrophy. (TR 125). A blood chemistry taken August 24, 1991 revealed normal carbamazepine level. (TR 126).

Eason's next examination was August 29, 1991 by Syed Ahmed, M.D. (TR 138–140). Dr. Ahmed's area of expertise was general psychiatry and chemical dependency. Eason told the doctor that he had been hospitalized in 1976 for alcohol abuse. Dr. Ahmed made the following diagnosis:

Axis I. 293.82 organic hallucinosis manifested by prominent o-factory hallucinations. Medical records indicate that he has possible partial complex seizure disorder and may be considered an etiology and 300.01 panic attacks without agoraphobia. He has discrete episodes of intense fear that occur more than once daily. He has shortness of breath, tremors, choking, sensation and sweating during these episodes.

In early September, Eason was evaluated at the neurology clinic. (TR 116–118). Eason reported taking Tegretol and Feldene,[8] that he drinks three beers a day, and that he forgets easily whether he took his medication. The clinic opined that Eason may suffer from complex partial seizure disorder, anosmia and major depression. To confirm this diagnosis, the Clinic wanted Eason to schedule an EEG, undergo a psychiatry consult, record his seizures, discontinue Tegretol and come for a follow-up appointment. *Id.* The psychiatry clinic did attempt to contact Eason, telephonically and by mail, but to no avail. (TR 119).

The next series of medical records are from the University of New Mexico Hospital located in Albuquerque, New Mexico. (TR 142–167). In May 1992, Eason went to the emergency room complaining of chest pain. (TR 160–167). Eason went back in June. His first visit was June 1. Eason was given Dilantin. (TR 158). On June 11, Eason had the long awaited EEG. The results for waking were normal, but during the sleep stage, there were a few right temporal spike discharges. This type of discharge indicates an epileptic tendency. (TR 154). On June 19, Eason went for a neurodiagnostic consult. (TR 155–156). Eason told Dr. Jan Catapong he consumes six beers a day. The doctor found that Eason lacked ankle jerks and had a mild subjective decrease in sensory function. Dr. Catapong felt this was attributable to either old nerve root dysfunction or alcoholic neuropathy. He opined that it would be beneficial for Eason to receive anti-depressant medication and alcohol counseling.

In August, Eason broke a rib during a seizure. (TR 149–153, 159). The progress notes indicate that the medications taken by Eason were Feldene, Zantac[9] and Dilantin and that his Dilantin level was to be monitored. Finally, on October 22, 1992, Eason reported that he still had tongue biting. (TR 146). On the same day, J.A. Vickers, M.D., a neurology resident, saw Eason. (TR 147). Vickers saw him again on August 15, 1992. Dr. Vickers opined that Eason would be disabled until his medication regimen was worked out. (TR 142).

*Issues*

Eason contends that the Secretary did not base her decision on substantial evidence and that she did not apply correct legal standards.

*Discussion*

**A. Standard of Review**

This Court's review of the Secretary's decision is not to try Plaintiff's claim *de novo*, but

---

7. Gynecomastia is "excessive development of the male mammary glands, due mainly to ductal proliferation with periductal edema, frequently secondary to increased estrogen levels...." *Stedman's Medical Dictionary,* 25th Edition Illustrated (1990), p. 676.

8. Feldene is indicated for acute or long-term use in the relief of signs and symptoms of the follow-

ing: (1) osteoarthritis, and (2) rheumatoid arthritis. *1995 Physicians' Desk Reference,* 49th Edition, p. 1900.

9. Zantac is indicated in treatment of ulcers. *1995 Physicians' Desk Reference,* 49th Edition, p. 1108.

to determine upon the whole record whether the Secretary's decision is supported by substantial evidence and whether the Secretary applied correct legal standards. *Glenn v. Shalala,* 21 F.3d 983 (10th Cir.1994); *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497–98 (10th Cir.1992); *Pacheco v. Sullivan,* 931 F.2d 695, 696 (10th Cir.1991). The Court must thoroughly examine the record to determine whether the Secretary's decision is supported by substantial evidence. The Court may not, however, reweigh the evidence or substitute its judgment for that of the Secretary. *Casias v. Secretary of Health and Human Services,* 933 F.2d 799, 800 (10th Cir.1991). Substantial evidence has been described as "more than a scintilla, it is such relevant evidence as a reasonable mind might deem adequate to support a conclusion." *Trimiar v. Sullivan,* 966 F.2d 1326, 1329 (10th Cir.1992) (quoting from *Jordan v. Heckler,* 835 F.2d 1314, 1316 (10th Cir.1987)). Thus, "evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir.1992).

■ To qualify for disability benefits, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which precludes claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Once the claimant has shown a disability, the burden shifts to the Secretary to demonstrate that the claimant, considering his age, education, work experience and physical shortcomings, still has the ability to do other work activity and that such jobs exist in the national economy. *Ray v. Bowen,* 865 F.2d 222, 224 (10th Cir.1989).

The Secretary has implemented a five-part sequential evaluation process for determining disability. *See* 20 CFR §§ 404.1520(a)–(f), 416.920; *see also Williams v. Bowen,* 844 F.2d 748, 750–52 (10th Cir.1988). Briefly, the five steps are (1) whether the claimant is presently working; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals an impairment listed in Appendix 1 of the relevant regulation; (4) whether the impairment precludes the claimant from continuing his past relevant work; and (5) whether the impairment prevents the claimant from doing any kind of work. *Trimiar,* 966 F.2d at 1329. The review process ends at any point in the process when the Secretary makes a finding as to disability.

■ Eason contends the ALJ erred at step four of the evaluation process when he found Eason able to return to his prior work as a heavy equipment mechanic. Eason asserts the ALJ should not have discounted the findings of Syed Ahmed, M.D. The ALJ gave no weight to Dr. Ahmed's diagnosis of panic attacks without agoraphobia. The ALJ took the position that Dr. Ahmed's conclusion was based solely on Eason's own description of the nature and frequency of the panic attacks instead of on his own clinical tests. The ALJ found it significant that Eason was not on any panic attack medication or undergoing treatment for panic attacks. Eason contends that it is not the function of an ALJ to extrapolate test results and come to his own medical opinion. Rather, Eason posits that the ALJ should have either ordered a consultative exam or sought the assistance of a medical advisor. Eason's arguments are well-taken. The law is clearly established that the ALJ may not substitute his own medical opinion for that of a doctor. *Wright v. Shalala,* 837 F.Supp. 985 (S.D.Iowa 1993) *See also Cruz v. Dept. of Health and Human Services,* 586 F.Supp. 61, 62 (D.P.R.1984) ("Administrative Law Judges are not medical experts their function is to gather and to weigh evidence, not to make diagnoses.") Therefore, the ALJ erred in making his own medical determination that Eason did not have panic attacks. Instead of discounting entirely Dr. Ahmed's diagnosis, the ALJ had two available options. One, to send Eason to another psychiatrist for an additional evaluation; or, two, to use the services of a medical advisor. Additionally, the ALJ's reliance on Eason's failure to take medication or to seek treatment for his alleged psychiatric impairment is misplaced. The Secretary states that Eason made no attempt to arrange for a psychiatric appointment. This statement is belied by the letter Eason sent explaining that he had no means

of transportation to get to an appointment. He claimed to have no vehicle, no friends or family to ask for a ride, or money to pay his way. The United States Court of Appeals for the Tenth Circuit in *Thompson v. Sullivan*, 987 F.2d 1482, 1490 (1993) set forth factors the ALJ must consider when examining the issue of the failure to pursue treatment or to take medication. Those factors are " '(1) whether the treatment at issue would restore claimant's ability to work; (2) whether the treatment was prescribed; (3) whether the treatment was refused; and, if so, (4) whether the refusal was without justifiable excuse.' " (quoting *Frey v. Bowen*, 816 F.2d 508, 517 (10th Cir.1987)). The ALJ must consider whether Eason's excuse for not seeing the psychiatrist was justified. If, indeed, the failure to keep an appointment was due to lack of economic resources, Eason should not be penalized. "A social security claimant will not be penalized for failing to seek treatment that [he] cannot afford." *Futrell v. Shalala*, 852 F.Supp. 437, 440 (E.D.N.C.1994). On remand, Eason must be given the opportunity to show cause why he did not seek treatment.

Likewise, the ALJ contends that Eason was non-compliant with his seizure medication. The Secretary contends this conclusion is substantiated by Eason's admission that he often forgets whether he took his medicine and, when in doubt, he does not take his requisite dosage. A review of the medical records shows Tegretol and Dilantin did help in controlling Eason's seizures and that Eason was candid with his health care providers about his propensity to forget to take his medication. The record, however, is absent blood tests showing a sub-therapeutic level of medication in Eason's blood, and, in fact, the only test result shows a normal therapeutic range for carbamazepine.

■ Eason contends that the ALJ did not adequately assess the problems associated with his alcohol abuse. The Secretary, on the other hand, contends the ALJ had no such duty because there is no evidence that Eason either lost control of his drinking or that alcoholism interferes with his ability to work.

■ An "ALJ has 'a basic obligation . . . to ensure that an adequate record is developed during the disability hearing consistent with the issues raised.' " *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir.1994) (quoting *Henrie v. United States Dep't of Health & Human Servs.*, 13 F.3d 359, 360–361 (10th Cir.1993)). In the case at bar, the record is replete with references to Eason's daily consumption of three to six beers. There is evidence that during one examination, his breath smelled like alcohol; that he was hospitalized in 1976 for alcohol abuse; and that his lack of ankle jerks and mild subjective decrease in sensory function may be attributed to alcoholic neuropathy. Notwithstanding the above, the ALJ made no inquiry of Eason about his alcohol use. When there is evidence of alcohol abuse, the ALJ must adequately inquire into whether a claimant can control his or her drinking. The ALJ must make a specific finding on the claimant's ability to control his drinking and the disabling effect of that drinking. *Cooper v. Bowen*, 815 F.2d 557, 560 (9th Cir.1987). The ALJ should also consider Eason's alcohol abuse in relation to its effects on Eason's seizure condition. *See Lucas v. Sullivan*, 918 F.2d 1567, 1572 (11th Cir.1990) ("It was incumbent on the ALJ to more fully develop the record with respect to the role alcohol abuse may play in precipitating her seizures or in affecting her compliance with the prescribed medication therapy.")

■ Eason challenges the sufficiency of the ALJ's past relevant work analysis. At this step, the ALJ must make specific findings about the claimant's residual functional capacity, the physical and mental demands of the prior jobs and the ability to do that type of activity given his or her limitations. *Henrie*, 13 F.3d at 361. Eason contends the Secretary skipped steps two and three. Eason's contention is well-taken. The ALJ set forth the abilities required by a heavy equipment operator and then surmised without explanation that a seizure disorder would not affect Eason's ability to be a heavy equipment mechanic. On remand, the ALJ should complete the last two steps of the analysis.

■ Finally, Eason maintains the ALJ erred by not taking into consideration that

he was the recipient of disability benefits by the State of New Mexico. A disability decision made by another governmental or non-governmental agency is not determinative of disability and is therefore not binding on the Secretary, but is, nonetheless, entitled some weight. *McCormick v. Shalala,* 872 F.Supp. 392 (E.D.Mich.1994). In the case at bar, although not mentioned in the decision, the ALJ was made aware at the hearing that Eason had the state benefit award and a copy of the award was a part of the record. The Court finds, that contrary to Eason's contention, the state disability determination was taken into account by the ALJ.

### Recommended Disposition

That Plaintiff's Motion to Remand be granted and the matter remanded to the Secretary for further proceedings consistent with this opinion.

### EXHIBIT "A"

### DEPARTMENT OF
### HEALTH AND HUMAN SERVICES
Social Security Administration
### OFFICE OF HEARINGS AND APPEALS
### DECISION

| IN THE CASE OF | CLAIM FOR |
| --- | --- |
| | Period of Disability, Disability Insurance Benefits, and Supplemental Security Income |
| John W. Eason | |
| (Claimant) | |
| | 457–52–9699 |
| (Wage Earner) | (Social Security Number) |

### CLAIMS FOLDER

### PROCEDURAL HISTORY

This case comes before me upon a request for hearing. Upon careful consideration of the documents described in the attached list of exhibits, the testimony presented at the hearing on January 13, 1993, and the arguments made, I issue a decision UNFAVORABLE to Mr. Eason on the disability issues presented by his applications. John W. Eason filed his application for disability insurance benefits under Title II of the Social Security Act (hereinafter "Act") on May 13, 1991. Mr. Eason also protectively filed his application for supplemental security income benefits under Title XVI of the Act on May 1, 1991. Mr. Eason alleges an inability to work since December 31, 1987, his amended alleged onset date. The issue to be determined is whether Mr. Eason is under "disability" as defined in the Act. A hearing on the matter was held before me on January 13, 1993 in Albuquerque, New Mexico. Mr. Eason was present with his attorney, Gary J. Martone.

### DISCUSSION AND EVALUATION
### OF THE EVIDENCE

John W. Eason is 56 years old, has a "limited" 10th grade education, and has past relevant work experience as a heavy construction equipment operator and mechanic.

The record shows that Mr. Eason has not engaged in substantial gainful activity since July 15, 1987.

I also find that the medical record shows that Mr. Eason has severe impairments consisting of a seizure disorder and a back strain (Exhibits 20 and 25).

I find that Mr. Eason has no severe psychological impairments. Although Mr. Eason has a diagnosis of panic attacks without agoraphobia, there is no evidence that his impairment has ever constituted more than a slight impairment having more than a minimal effect on Mr. Eason's ability to perform basic work activities as defined in 20 CFR 404.1521 and 416.921. An August 29, 1991 psychiatric evaluation by Dr. Syed Ahmed states that Mr. Eason has reported that he has attacks of intense fear, as if his soul is leaving his body. Mr. Eason stated that he gets these attacks several times a day. He has to walk around in order to get rid of these attacks. He becomes dizzy during these attacks and experiences palpitations. He also experiences tremors and has strange feelings in his stomach and feels pressure in his chest. He has also complained of failing memory, including problems remembering his name and the names of his friends. Dr. Ahmed diagnosed Mr. Eason with panic attacks without agoraphobia. He concluded that Mr. Eason experienced discrete episodes of intense fear that occurred more than once daily. He has shortness of breath, tremors,

and a choking sensation and sweating during these episodes (Exhibit 21).

First of all, I note that Dr. Ahmed's conclusions are based solely on Mr. Eason's own reports of the nature and frequency of the alleged panic attacks. Dr. Ahmed's diagnosis is not supported by his findings with respect to Mr. Eason's mental status and cognitive functioning. With respect to Mr. Eason's mental status, Dr. Ahmed concluded that Mr. Eason was cooperative and made good eye to eye contact. He was comfortable during the interview. His mood euthymic and his affect appropriate. His speech was normal in tone and latency of response. His though process was coherent, with well organized and goal directed conversation. He did not have delusions. However, olfactory hallucinations were present (Exhibit 21). There is no evidence that these hallucinations interfere with his ability to perform work activities in any significant way.

Dr. Ahmed also concluded that Mr. Eason was oriented to time, place, person, and situation. Despite complaints of memory loss, he was able to recall all three test objects correctly after five minutes. He was also able to do six digits forward and four in reverse order without any mistakes. He was able to recall his date of birth and social security number. He was able to recall the past president of the United States. He was able to serial seven's using pen and paper. He knew that 20 nickels made a dollar. His proverb interpretation and judgement were appropriate (Exhibit 21).

Dr. Ahmed also reported that Mr. Eason gets up in the morning around 6 a.m. and takes a walk. He then turns on the television to watch the news. He goes out with his friends for a ride but does not have any other leisure pursuits. He prepares his own meals and visits friends weekly. He is able to take care of his own personal needs (Exhibit 21). I also note that Mr. Eason informed Dr. Ahmed that he has severe panic attacks more than once daily, although he testified that he normally has them two to three times a week.

I also note that Mr. Eason is not on any medication and is not requiring counseling for this impairment (Exhibit 27). Dr. Cheng observed that Mr. Eason was mentally oriented, had appropriate affect and behavior, coherent speech and intact memory. He had an average attention span, related well to office staff, and had no delusions or hallucination (Exhibit 20, p. 5).

Thus, I conclude that Mr. Eason's panic attack disorder has not been a severe impairment at any time in question.

Although there is evidence that Mr. Eason drinks an average of six beers a day (Exhibit 25, p. 11), I also find that Mr. Eason does not suffer from alcoholism that has been a severe impairment at any time in question. Although there is no evidence that Mr. Eason has at any time in question been an alcoholic, I note that according to Social Security Ruling 82–60, "alcoholism" is a diagnostic term that does not denote impairment value or severity. An alcoholic may not be disabled if the evidence fails to show inability to engage in substantial gainful activity. Also, pursuant to Cooper v. Bowen, 815 F.2d 557, 560–1 (9th Cir.1987), a claimant who seeks disability benefits on the grounds of alcoholism must prove that he is addicted to alcohol and has lost the ability to control his drinking. In addition, the claimant must show that his alcoholism precludes him from engaging in substantial gainful activity. First, I find that there is no evidence in this case that Mr. Eason has lost the ability to control his drinking. Secondly, the evidence does not show that Mr. Eason's drinking has at any time had a significant effect on his ability to perform substantial gainful activity. In fact, drinking or alcoholism is not mentioned as a factor affecting Mr. Eason's functioning in the consultative psychiatric evaluation by Dr. Ahmed (Exhibit 21). He told Dr. Ahmed that he has used alcohol quite heavily during the early 1970's, a period of time in which he was employed (Exhibit 21, p. 2).

I find that neither of Mr. Eason's severe impairments, either alone or in combination, meets or equals any of the impairments listed in Part 404, Subpart P, Appendix 1 of Social Security Regulations No. 4. I pay particular attention to Listing Sections 1.05C

and 11.03. First of all, I conclude that Mr. Eason's back condition does not meet or equal the listing criteria set forth in listing section 1.05C. Mr. Eason's diagnosis is only of a strain of the back (Exhibit 20, p. 5). There is no evidence of spinal deformity (Exhibit 20, p. 3). The July 23, 1991 consultative examination report by Dr. Cheng found Mr. Eason's sensory, reflex, and motor function to be normal (Exhibit 20, p. 4). A May 23, 1991 neurology clinic report similarly found Mr. Eason's motor, sensory, and reflex functioning to be normal except for decreased vibratory sense in the lower extremity (Exhibit 19, p. 9). Although a June 19, 1992 neurodiagnostic consultation by Dr. Joseph Bicknell found absent ankle jerks and a mild subjective decrease in sensory function, the examination was otherwise normal (Exhibit 25, p. 11).

I also find that Mr. Eason's seizure disorder does not meet or equal the listing criteria set forth in Listing Section 11.03. Social Security Ruling 87–6 provides that "an allowance on the basis of meeting listing level severity is warranted only when the individual is following a treatment regimen prescribed by his treating source and continues to have seizures of the specified frequency." Thus, a listing level impairment finding is not appropriate in the absence of an ongoing treatment source for the monitoring of epilepsy.

Social Security Ruling 87–6 also provides that a seizure disorder is not of listing level severity if the claimant is non-compliant with his medications. Mr. Eason has been taking Dilantin since only May 1992 (Exhibit 27). Although an October 22, 1992 progress note of the University of New Mexico Hospital instructs Mr. Eason to check his Dilantin level (Exhibit 25, p. 2), there is no evidence that Mr. Eason has done so. In fact, this October 22, 1992 "outpatient treatment log" is the most recent one provided by Mr. Eason. In his "Claimant's Statement When Request for Hearing Is Filed and the Issue is Disability," dated May 28, 1992, Mr. Eason stated that he has not been treated or examined by a doctor and has not been taking any medications except for Zantac for ulcers since November 29, 1991, the date he filed

his request for reconsideration. Although he stated that he still has seizures even with medications, this same report does not show that he was taking any medications for seizures (Exhibit 14). Also, his "Disability Report" does not reveal any treatment for seizures (Exhibit 11). Also, Mr. Eason forgets whether he has taken his medications and testified that when he forgets, he does not take his medications (Exhibit 19, p. 1 and testimony).

Thus, even if I were to fully credit Mr. Eason's testimony that he experiences several minor motor seizures a day, I cannot find that Mr. Eason's impairment has at any time met or equaled the Listing level impairments set forth in Section 11.03, because of the absence of a prescribed treatment regimen by a treating source and his non-compliance with medication.

Although I give Mr. Eason the benefit of the doubt and find that he cannot perform his past relevant work as a heavy equipment operator because of a seizure disorder, I find that he could return to his past relevant work as a heavy equipment mechanic. Mr. Eason has described the exertional requirements of his past relevant work as requiring 5 hours a day of walking, 4 hours a day of standing, 6 hours a day of sitting, frequent bending, occasional reaching, and lifting no greater than 10 pounds (Exhibit 11, p. 6). Although Mr. Eason testified that he had to lift weight of up to several hundred pounds, I find this testimony not to be credible because of the marked contradiction with his earlier statement noted above.

I find that Mr. Eason has not credibly established that his pain is of sufficient severity to preclude performance of his past relevant work as a heavy equipment mechanic as he has described it. In evaluating the credibility of Mr. Eason's pain complaints, I must use a three step process (*Williams v. Bowen*, 844 F.2d 748, 753 (10th Cir.1988)). First, I must determine whether an impairment exists that could be considered a "pain-producing impairment." (See *Luna v. Bowen*, 834 F.2d 161, 163 (10th Cir.1987)). This step does not consider subjective evidence. In the present case, I find that there is sufficient objective evidence to indicate the presence of a pain-

producing impairment with respect to Mr. Eason's hip, back, and leg pain. I also find that his seizure disorder is a pain-producing impairment with respect to his headaches. However, I find that there is no pain-producing impairment with respect to the hand pain that he alleges.

Next, I must determine whether there is a relationship between the pain-producing impairments and the pain that is alleged. In other words, I must determine whether the pain-producing impairments could reasonably be expected to produce the kind of pain that Mr. Eason alleges. At this step, I will assume that Mr. Eason's pain allegations are true. Thus, under prevailing case law, I give full faith and credit to Mr. Eason's pain complaints and find that his back impairment and seizure disorder could reasonably be expected to produce some pain of the type that he alleges.

Since the first two steps of the test are satisfied, I must consider all evidence, objective and subjective, relating to pain and make a credibility finding. See 20 CFR 404.1529(c) and 416.929(c). Further, these sections require consideration of such factors as the nature, location, onset, duration, frequency, radiation, and intensity of pain, as well as precipitating and aggravating factors. The types of medication and other types of treatment must be considered, as well as the individual's functional restrictions and activities.

Although Mr. Eason has indicated that he is currently under the care of the University of New Mexico Hospital (Exhibit 26, p. 1), his disability report reveals no medical treatment except for treatment at a Clinic in 1989 and April 1990 (Exhibit 11). Also, there is no indication of any medical care between November 29, 1991 and May 28, 1992 (Exhibit 14). Mr. Eason has submitted medical records from the University of New Mexico Hospital covering only the period from May until October 1992 (Exhibit 25). He has stated that he has been taking Dilantin, which was first prescribed in May 1992 (Exhibit 26, p. 1). He is also taking Inderal for headaches and chest pain and Cydobenzaprine for pain (Exhibit 26, p. 2). As of July

23, 1991, Mr. Eason was taking Feldene, which he said helped relieve his pain (Exhibit 20, p. 1). The evidence also shows that as of September 6, 1991 Mr. Eason was taking Tegretol (Exhibit 19, p. 1). Mr. Eason also testified that he uses a cane and crutches as assistive devices.

Mr. Eason has described his pain as a pain in the lower back that radiates to both legs, the left being worse than the right. He experiences pain in the back of his neck, both shoulders, and both elbows, the left being worse than the right. He also has a right little finger that is painful and that he is unable to straighten out. He testified that while sitting, his left leg goes to sleep within 20 minutes to an hour. He is able to walk "pretty well" for not greater than a quarter mile. His pace is that of a "normal walk." He testified that he has difficulty with prolonged standing because of a knife-like pain. He informed Dr. Cheng that he can walk a mile but loses control of his balance and falls alot (Exhibit 20, p. 1). However, Mr. Eason testified that his balance is "pretty good" most of the time.

Although I emphasize subjective complaints in this analysis, I may take into account objective findings, pursuant to 20 CFR 404.1529(c) and 416.929(c). In his July 23, 1991 consultative examination report, Dr. Cheng observed no deformity of the spine. There were no muscle spasms in the lower back. Flexion of the back from vertical was 90 degrees. Lateral bending was 30 degrees to the right and 30 degrees to the left. Rotation to the right was 45 degrees into the left 45 degrees. Extension of the back was 10 degrees. There was only slight discomfort in moving the back. There was no evidence of any muscle spasms or tenderness in the neck. Sensory, reflex, and motor function were all normal. Joint movement in the upper extremities was not limited. There was no evidence of any joint deformity or of any acute inflammatory sign of the joints in the upper extremities. A July 23, 1991 x-ray of the left hip revealed no abnormality. He was able to walk on tiptoes and heels, do tandem walk, squat, and hop on both legs. Dr. Cheng concluded that Mr. Eason retains the ability to independently bathe, dress,

shop, cook, drive, and take public transportation. He was able to lift a 10 pound bag of groceries up a flight of stairs. He can stand/walk for 6 to 8 hours per day and sit 6 to 8 hours. He can stand 4 out of 8 hours and can sit 6 out of 8 hours. There was no ability in any other areas that might affect Mr. Eason's potential for work related activities. He was able to handle objects and ambulate without assistance (Exhibit 20).

A neurodiagnostic consultation by Dr. Bicknell, dated June 19, 1992 revealed an examination that was essentially normal except for absent ankle jerks and mild subjective decrease in sensory function. Nerve conduction velocity studies were normal on the left peroneal tibial and sural nerve. The superficial peroneal sensory response was absent but this response may be unattainable in normal individuals over the age of 50. EMG of the left lower extremity from the foot the paraspinous muscle showed no abnormality. Although Dr. Bicknell stated that Mr. Eason's absent ankle jerks and distal sensory symptoms could reflect old nerve root dysfunction or alcoholic neuropathy, he could not confirm either of these conclusions by positive electrical abnormalities (Exhibit 25, pp. 11 and 12).

An October 22, 1992 outpatient treatment log by the University of New Mexico Hospital revealed constant muscle spasms in the neck (Exhibit 25, p. 2).

Mr. Eason's daily activities are also consistent with an ability to perform his past relevant work. He testified that he can walk to the grocery store around the corner but cannot stand while shopping. He stated that he is able to prepare meals, clean, do the laundry, and mow the lawn according to how he feels (Exhibit 11, p. 4). He told Dr. Cheng that he is able to cook and wash dishes (Exhibit 20, p. 1). He stated that he is able to sweep the floor and handwash clothes when necessary (Exhibit 12, p. 3). Although he testified that he experiences sleep disturbance, he told Dr. Ahmed that his sleep is not a problem (Exhibit 21, p. 3).

I also conclude, after considering Mr. Eason's pain complaints as a non-exertional impairment, that his pain does not impose any additional restrictions under the otherwise existing occupational base. There is no evidence that his pain adversely affects his ability to maintain attention or concentration or his ability to understand or remember job instructions, pursuant to 20 CFR 404.1569a(c) and 416.969a(c). In fact, Mr. Eason's memory, concentration, and cognitive functioning were determined to be essentially normal (Exhibit 21, p. 2 and 20 p. 5).

I also conclude that Mr. Eason has not credibly established that he has any significant impairment and bilateral manual dexterity. First of all, there is no objective abnormality in any of Mr. Eason's upper extremities. Joint movement is not limited. Deep sensation and superficial sensation were intact. There is evidence of any joint deformity or of any acute inflammation of any joints. He is able to hold a pencil and button clothes (Exhibit 20, p. 4). He is able to handle objects (Exhibit 20, p. 6).

I also find that Mr. Eason's seizure disorder does not compromise his ability to perform his past relevant work as a heavy equipment mechanic. A MRI of the brain on August 14, 1991 revealed minimal deep white matter infarctions in both cerebral hemispheres. In addition, there was minimal to moderate cerebral atrophy (Exhibit 19, p. 10). A June 11, 1982 EEG report revealed that the waking EEG was normal. However, during sleep, a few right temporal spike discharges were present, suggesting an epileptic tendency (Exhibit 25, p. 10).

I emphasize the lack of treatment and noncompliance with medication described above. The record shows that Tegretol and Dilantin helped control Mr. Eason's seizures (Exhibit 19, p. 1 and 25, p. 2).

Although Mr. Eason testified that he has quit driving and has not driven for five to six months, he stated on May 13, 1991 that he does drive with someone else in the car (Exhibit 12, p. 5).

Mr. Eason's psychological impairments do not significantly interfere with his ability to perform his past relevant work.

Accordingly, I conclude that John W. Eason has not been disabled, within the meaning of

20 CFR 404.1520(e) and 416.920(e), at any time prior to the date of this decision.

Reopening of any prior applications for disability insurance and/or supplemental security income benefits filed by Mr. Eason is expressly denied.

## FINDINGS

After careful consideration of the entire record, I make the following findings:

1. John W. Eason met the special earnings requirements for disability insured status on December 31, 1987, the date he alleges he became unable to work, and continues to meet them through at least the date of this decision.

2. Mr. Eason is 56 years old, has a "limited" 10th grade education, and has past relevant work experience as a heavy construction equipment operator and mechanic.

3. Mr. Eason has not engaged in substantial gainful activity since July 15, 1987.

4. The medical establishes that Mr. Eason has severe impairments consisting of a seizure disorder and a back strain, but also that neither of these impairments, either alone or in combination, meets or equals any of the impairments listed in Part 404, Subpart P, Appendix 1 of Regulations No. 4.

5. Mr. Eason is able to return to his past relevant work as a heavy equipment mechanic.

6. Mr. Eason has not credibly established that his pain is of sufficient severity to preclude the performance of his past relevant work.

7. Mr. Eason has the residual functional to perform his past relevant work.

8. Mr. Eason's non-exertional pain does not impose any additional restrictions or his existing occupational base.

9. Mr. Eason's seizure disorder does not preclude him from performing his past relevant work.

10. John W. Eason is not under a "disability" as defined in the Act at 20 CFR 404.1520(e) and 416.920(e).

11. Reopening of any prior applications for disability insurance and/or supplemental security benefits filed by Mr. Eason is expressly denied.

## DECISION

IT IS MY DECISION, based on the applications for disability insurance and supplemental security benefits filed on May 13, 1991 and May 1, 1991, respectively, that John W. Eason is not entitled to a period of disability or disability insurance benefits under Section 216(i) or 223(a) of the Act or to supplemental security income benefits under Sections 1614(a)(3)(A) of the Act.

Reopening of any prior applications for disability insurance and/or supplemental security income benefits filed by Mr. Eason is expressly denied.

/s/ John J. Wren
JOHN J. WREN
United States
Administrative Law
Judge
MAR 08 1993
Date

## OHA PSYCHIATRIC REVIEW TECHNIQUE FORM

Name: John W. Eason SSN: 457–52–9699

Assessment is for: Other: December 31, 1987 to date of decision

| Administrative Law Judge's Signature | Date |
|---|---|
| /s/ | MAR 08 1993 |

I. MEDICAL SUMMARY
A. Medical Disposition(s): Impairment(s) Not Severe

B. Based Upon Category(ies): 12.06, 12.09

II. Reviewer's Notes (Does not apply to OHA)

III. DOCUMENTATION OF FACTORS THAT EVIDENCE THE DISORDER (Evaluation of the existence of a sign or symptom CLUSTER or SYNDROME for the Listed Disorder.)

| PRESENT | ABSENT | | | |
|---------|--------|---|---|---|
| [ ] | [x] | A. | 12.02 | Organic Mental Disorders |
| [ ] | [x] | B. | 12.03 | Schizophrenic, Paranoid and other Psychotic Disorders |
| [ ] | [x] | C. | 12.04 | Affective Disorders |
| [ ] | [x] | D. | 12.05 | Mental Retardation and Autism |
| [x] | [ ] | E. | 12.06 | Anxiety Related Disorders |
| [ ] | [x] | F. | 12.07 | Somatoform Disorders |
| [ ] | [x] | G. | 12.08 | Personality Disorders |
| [x] | [ ] | H. | 12.09 | Substance Addiction Disorders |

E. **12.06 Anxiety Related Disorders**—Anxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms, as evidenced by at least one of the following:

**PRESENT–ABSENT–INSUFFICIENT EVIDENCE**

1. [ ] [x] [ ] Generalized persistent anxiety accompanied by three of the following:
 a. [ ] Motor tension, or
 b. [ ] Autonomic hyperactivity, or
 c. [ ] Apprehensive expectation, or
 d. [ ] Vigilance and scanning
2. [ ] [x] [ ] A persistent irrational fear of a specific object, activity or situation which results in a compelling desire to avoid the dreaded object, activity, or situation
3. [x] [ ] [ ] Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week
4. [ ] [x] [ ] Recurrent obsessions or compulsions which are a source of marked distress
5. [ ] [x] [ ] Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress
6. [ ] [x] [ ] Other:

H. **12.09 Substance Addiction Disorders**—Behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system.

If present, evaluate under one or more of the most closely applicable listings:

1. [ ] Listing 12.02—Organic mental disorders*
2. [ ] Listing 12.04—Affective disorders*
3. [x] Listing 12.06—Anxiety disorders*
4. [ ] Listing 12.08—Personality disorders*
5. [ ] Listing 11.14—Peripheral neuropathies*
6. [ ] Listing 5.05—Liver damage*
7. [ ] Listing 5.04—Gastritis*
8. [ ] Listing 5.08—Pancreatitis*
9. [ ] Listing 11.02 or 11.03—Seizures*
10. [ ] Other:

*NOTE: Items 1, 2, 3, 4, 5, 6, 7, 8 and 9 correspond to Listings 12.09A, 12.09B, 12.09C, 12.09D, 12.09E, 12.09F, 12.09G, 12.09H, and 12.09I, respectively. If items 1, 2, 3 or 4 are checked, only the numbered items in subsections IIIA, IIIC, IIIE, or IIIG of the form need be checked. The first two blocks under the disorder heading in those subsections need not be checked.

## RATING OF IMPAIRMENT SEVERITY

A. "B" Criteria of the Listings

The following functional limitations (which apply to paragraph B of listings 12.02–12.04 and 12.06–12.08 and paragraph D of 12.05) exist as a result of the individual's mental disorder(s).

NOTE: Items 3 and 4 below are more than measures of frequency. Duration and effects of the deficiencies (item 3) or episodes (item 4) are discussed in the decision.

Listing(s) under which the items below are being rated: 12.06, 12.09

### FUNCTIONAL LIMITATION AND DEGREE OF LIMITATION

---

Restrictions of Activities of Daily Living:

[ ] Slight[x] Moderate[ ] Marked*[ ] Extreme[ ] Insuff Evid[ ]

---

Difficulties in Maintaining Social Functioning:

[x] Slight[ ] Moderate[ ] Marked*[ ] Extreme[ ] Insuff Evid[ ]

---

Deficiencies of Concentration, Persistence or Pace Resulting in Failure to Complete Tasks in a Timely Manner (in work settings or elsewhere):

[ ] Seldom[x] Often[ ] Frequent*[ ] Constant[ ] Insuff Evid[ ]

---

Episodes of Deterioration or Decompensation in Work or Work–Like Settings Which Cause the Individual to Withdraw from that Situation or to Experience Exacerbation of Signs and Symptoms (which may Include Deterioration of Adaptive Behaviors):

[x] Once/Twice[ ] Repeated*(3+)[ ] Continual[ ] Insuff Evid[ ]

---

Free of limitation that satisfies the Listings: Extreme, Constant and Annual also satisfy that requirement.

### Summary of Functional Limitation Rating for "B" Criteria

FUNCTIONAL LIMITATIONS MANIFESTED AT THE LISTING LEVEL: [0] The number must be at least 2 to satisfy the requirements of paragraph B in listings 12.02, 12.03, 12.04 and 12.06 and paragraph D in 12.05; and at least to satisfy the requirements in paragraph B in Listings 12.07 and 12.08.)

"C" Criteria of the Listings

If 12.06 Disorder (Anxiety Related)

**PRESENT–ABSENT–INSUFFICIENT EVIDENCE**

[ ] [x] [ ] Symptoms resulting in complete inability to function independently outside the area of one's home.

If present is checked, the requirements in paragraph C of 12.06 are satisfied.